IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RUBY LEE JOHNS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:13-CV-4420-N-BH |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

By order of transfer filed January 23, 2014, this matter has been transferred for the conduct of all further proceedings and the entry of judgment.  Before the Court are *Plaintiff's Brief (Corrected)*, filed March 18, 2014 (doc. 24), and *Defendant's Brief*, filed March 28, 2014 (doc. 25). Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for reconsideration.

## I.  BACKGROUND[1]

A.      **Procedural History**

Ruby Lee Johns (Plaintiff) seeks judicial review of a final decision by the Acting Commissioner of Social Security (Commissioner) denying her claim for supplemental security income (SSI) under Title XVI of the Social Security Act.  (Doc. 1.)  On June 16, 2011, Plaintiff applied for SSI, alleging disability beginning on October 30, 2010. (R. at 140.)  Her claim was denied initially and upon reconsideration.  (R. at 74-75.)  Plaintiff requested a hearing before an

---

[1]  The background information is summarized from the record of the administrative proceeding, which is designated as "R."

Administrative Law Judge (ALJ), and personally appeared and testified at a hearing held on August 20, 2012.  (R. at 21-73.)  On September 11, 2012, the ALJ issued a decision finding Plaintiff not disabled.  (R. at 7.)  Plaintiff appealed, and the Appeals Council denied her request for review on September 11, 2013, making the ALJ's decision the final decision of the Commissioner.  (R. at 1.)  Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

**B.**   **Factual History**

    **1.**   **Age, Education, and Work Experience**

Plaintiff was born on December 19, 1966, and was 45 years old at the time of the hearing.  (R. at 33, 140.)  She finished 11th grade in high school and had past relevant work experience as a cafeteria counter attendant, cafeteria cook, and food service worker.  (R. at 35, 64-65.)

    **2.**   **Medical Evidence**

Plaintiff visited Baylor University Medical Center (Baylor) Emergency Room (ER) with a complaints of headache and an insect bite on March 23, 2011.  (R. at 239.)  Dr. Jeffrey Appel, M.D., noted that Plaintiff was hypertensive.  (*Id.*)  She had full normal range of motion of her extremities.  (*Id.*)  Plaintiff was alert, and was oriented as to person, place, time, and situation, and her mood and affect were within normal limits.  (*Id.*)  Dr. Appel's impression was hypertension and allergic reaction to an insect bite.  (R. at 240.)  He recommended a low-salt diet and prescribed Benadryl and Norco.  (*Id.*)

On April 19, 2011, Arjumand Ghayas, M.D., at Parkland Health & Hospital System (Parkland) saw Plaintiff for her bilateral knee pain and an insect bite.  (R. at 255.)  Dr. Ghayas noted that she had elevated blood pressure, chronic knee pain, and a rash on her right arm due to an insect bite.  (*Id.*)  She reported taking over-the-counter Benadryl and was feeling better.  (*Id.*)  Plaintiff's

systems were normal.  (*Id.*)  Dr. Ghayas observed that Plaintiff exhibited tenderness in her knees, but saw no joint effusion or redness.  (R. at 256.)  Her assessment was hypertension, knee pain, and depression that was stable on medications.  (*Id.*)

On February 11, 2011, an X-ray of Plaintiff's right knee was taken at Parkland.  (R. at 282-83.)  Gina Cho Sims, M.D., observed that there were mild tricompartmental degenerative changes.  (R. at 283.)  She noted that the "[t]iny fragment within the joint space as seen on the frontal projection [was] likely degenerative."  (*Id.*)  The result impression was "[r]ight knee osteopenia and degenerative changes."  (*Id.*)

On June 10, 2011, Iram Hamdard, M.D., at Parkland saw Plaintiff.  (R. at 299-303.)  Plaintiff complained of pain in both knees.  (R. at 300.)  Dr. Hamdard observed crepitus in both knees and tenderness to palpation around both knee joints, but no erythema or swelling.  (R. at 301.)

On July 14, 2011, Caroline Love, a state vocational consultant, completed a Sequential Vocational Guide.  (R. at 198.)  It noted that Plaintiff had past relevant work during "the 15-years prior to [the] current date of adjudication" as a server, DOT 311.477-030(2L), dining room attendant, DOT 311.677-018(2M), counter attendant, DOT 311.477-014(2L), and food service worker, DOT 319.677-014(2M).  (*Id.*)  Ms. Love concluded that "[o]n a function-by-function basis, [Plaintiff's residual functional capacity did not] rule out the ability to . . . [p]erform all past relevant jobs as described in the DOT[.]"  (*Id.*)

On July 21, 2011, Karen Lee, M.D., a state agency medical consultant (SAMC), reviewed Plaintiff's medical file and completed a physical residual functional capacity (RFC) assessment.  (R. at 327-34.)  She opined that Plaintiff had the following external limitations: occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and/or walk about six hours in an eight-

hour workday, sit for a total of about six hours in an eight-hour workday, and push and pull without limitation other than what was shown for lift and/or carry.  (R. at 328.)  Dr. Lee also opined that Plaintiff had the following postural limitations: occasionally climb ramp/stairs; never climb ladder, rope, or scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl.  (R. at 329.)  She found no manipulative, visual, communicative, or environmental limitations.[2]  (R. at 330-31.)  Dr. Lee concluded that Plaintiff's limitations were partially credible.  (R. at 334.)

On August 1, 2011, Plaintiff presented at Parkland ER, complaining of bilateral knee pain and requesting a refill of Hydrocodone and a cane.  (R. at 351-65.)  Iram Hamdard, M.D., attended her.  (*Id.*)  Plaintiff's blood pressure was 133/87, and she weighed 239 pounds with a body mass index (BMI) of 45.61.  (R. at 357.)  Her physical examination was normal, but Dr. Iram found "[t]enderness to palpation along [the] joint lines" bilaterally and slight warmth, with no erythema or swelling.  (*Id.*)  She was prescribed five 325-milligram Hydrocodone tablets and 800-milligram ibuprofen tablets.  (R. at 353-54.)

On August 10, 2011, Arjumand Ghayas, M.D., saw Plaintiff at Parkland for a rash on her right arm caused by an insect bite.  (R. at 465, 467.)  Plaintiff's blood pressure was high even though she was taking all of her medications regularly.  (R. at 467.)  She had no chest pain, shortness of breath, or palpitations.  (*Id.*)  Her systems were normal except for the rash and itching.  (*Id.*)  Her physical exam was also normal.  (R. at 468.)  Plaintiff's blood pressure was 186/99, and she weighed 238 pounds with a BMI of 39.61.  (R. at 467.)  Dr. Ghayas's assessment was an insect bite, hypertension, and left knee pain.  (R. at 468.)  He started Plaintiff on Losartan 25-milligrams daily

---

[2]  In reaching her conclusions, Dr. Lee reviewed medical evidence outside of the relevant period, from August 30, 2010 through June 10, 2011.  (*See* R. at 334.)

for her hypertension.  (R. at 470.)

On August 24, 2011, a magnetic resonance imaging (MRI) of Plaintiff's knees were taken, and the results were reviewed by Gina Sims, M.D.  (R. at 461-63.)  Plaintiff's right knee had "[r]adial tear of the posterior horn of the medial meniscus at the meniscal root attachment with resultant extrusion of the medial meniscus and secondary degenerative changes of the medial compartment with full-thickness cartilage loss."  Dr. Sims also noted "[m]ucoid degeneration of the proximal anterior cruciate ligament[,]" "[m]ild patellofemoral degenerative changes[,]" and "[s]mall knee joint effusion" with "evidence of synovitis."  (R. at 462.)  The MRI of Plaintiff's left knee showed "[p]rominent myxoid degeneration of the posterior horn of the medial meniscus with some slight extrusion of the body."  (R. at 463.)  Dr. Sims also observed what seemed to be an old injury to the proximal MCL with indistinct deep MCL fibers.  (*Id.*)  Plaintiff had moderate size joint effusion with associated synovitis and mild pes anserine bursitis.  (*Id.*)

On August 30, 2011, Diedre Hubbard, a state vocational consultant, completed a Sequential Vocational Guide.  (R. at 222.)  She noted that Plaintiff had past relevant work during the past 15 years prior to the current date of adjudication as a server, DOT 311.477-030.  (*Id.*)  She concluded that on a function-by-function basis, Plaintiff's RFC ruled out her ability to perform all past relevant jobs as described by her, but did not rule out her ability to perform all relevant jobs as described in the DOT.  (*Id.*)

On August 31, 2011, Michael Greaser, M.D., saw Plaintiff at Parkland for bilateral joint pain. (R. at 451.)  Plaintiff had blood pressure of 155/97 and weighed 236 pounds, and her BMI was 44.61.  (R. at 450, 452.)  The X-rays of her knees showed mild peripheral osteophytes, her joint spaces were mildly narrowed, and a small ossicle was observed above tibial spines.  (R. at 453.)  An

MRI of her right knee revealed mild degenerative changes, mild medial compartment chondromalacia, and degenerative tears at the medial meniscus posterior horn.  (*Id.*)  Dr. Greaser's assessment was bilateral knee degenerative joint disease, pes bursitis.  (*Id.*)  He administered bilateral knee steroid injections.  (R. at 453-54.)

On September 26, 2011, Patty Rowley, M.D., an SAMC, reviewed the July 21, 2011 RFC assessment along with all of the evidence in file.  (R. at 366.)  Dr. Rowley listed Plaintiff's medically determinable impairments as hypertension, obesity, and degenerative joint disease in her knees.  (*Id.*)  She affirmed Dr. Lee's RFC assessment as written.  (*Id.*)

On October 24, 2011, Plaintiff went to Baylor ER for knee pain and swelling.  (R. at 432-33.)  Amanda Bruggman, M.D., attended her.  (R. at 432.)  Although Plaintiff complained of pain, she was able to bear her weight and ambulate.  (R. at 433.)  Dr. Bruggman observed that at their worst, Plaintiff's symptoms were mild.  (*Id.*)  Plaintiff reported that she felt popping in her left knee while she was walking three days ago.  (*Id.*)  An examination of her extremities was positive for pain and swelling of the left knee.  (*Id.*)  There was no evidence of decreased range of motion, however.  (*Id.*)  Plaintiff was discharged when her condition was stable, and Dr. Bruggman recommended she follow-up with her primary care physician within two to three days.  (R. at 434.)

On the same day, an X-ray of Plaintiff's left knee was taken and read by resident Kendall Yokubaitis.  (R. at 435.)  When compared with the previous X-ray from January 28, 2010, "[t]ricompartment osteoarthritic changes" were observed "with joint space narrowing and osseous spurring," particularly in the patellofemoral compartment.  (R. at 435.)

On November 22, 2011, Plaintiff saw Cornelia Tan, M.D., at Parkland to follow up for swelling in her knees.  (R. at 441-42.)  Plaintiff reported that she recently fell after hearing a popping

sound from her left knee.  (R. at 442.)  She went to an urgent care clinic and got started on Tramadol, but she still had pain.  (*Id.*)  Plaintiff declined Gabapentin for pain, however.  (*Id.*)  She had received an injection from Parkland's orthopedic clinic in August 2011, but it last only two weeks.  (R. at 441.)  Plaintiff weighed 236 pounds, her BMI was at 44.74, and an MRI showed degenerative joint disease.  (R. at 441-42.)  A physical examination revealed that Plaintiff had swelling and effusion in her left knee, but no deformity or erythema.  (R. at 443.)  Dr. Tan's assessment was knee pain and unspecified essential hypertension.  (*Id.*)  She recommended that Plaintiff limit exercise until she saw a physical therapist.  (*Id.*)

On January 6, 2012, Plaintiff saw Emily Tippett, a physical therapist at Parkland, for an initial treatment.  (R. at 517.)  They set a 12-week goal, and Ms. Tippett taught Plaintiff various exercises she could do at home to gain strength and flexibility in her knees, and some techniques for joint protection.  (*Id.* )

On January 25, 2012, X-rays of Plaintiff's bilateral knees were taken at Parkland.  (R. at 518.)  Daniel Moore, M.D., compared the X-rays to the ones taken on February 11, 2011, and observed that her tricompartment degenerative changes had worsened.  (*Id.*)  The changes were "most prominent in the medial and patellofemoral compartments with right medial compartment" most significantly affected.  (*Id.*)  Both knees also had "small degenerative osteochondral bodies[.]" (*Id.*)  The final impression was "[b]ilateral degenerative changes," mostly in the medial and patellofemoral compartments, that were worse than in the previous reading.  (*Id.*)

On the same day, Plaintiff saw Michael Khazzam, M.D., at Parkland.  (R. at 511-12.)  Dr. Khazzam noted that Plaintiff had received bilateral steroid injections several months before the appointment for her knee pain, and that the injections helped for a couple weeks, but the pain had

returned. (R. at 511.) She reported that she was doing physical therapy, which helped some, but she still suffered from "fairly significant pain." (*Id.*) On physical examination, Dr. Khazzam noted that Plaintiff was "morbidly obese." (*Id.*) He observed that Plaintiff's left knee had a small effusion, tender to palpation along the medial joint line, and there was tenderness along Plaintiff's patella tendon and mild tenderness on the lateral joint line. (*Id.*) Plaintiff's right knee was similar, but her pain was significantly less to palpation along the medial joint line. (*Id.*) Dr. Khazzam reviewed Plaintiff's bilateral X-rays on her knees and observed a varus knee with medial joint space narrowing and arthritic changes in the patellofemoral joint in each knee, but that was worse in the left knee. (R. at 512.) His assessment was bilateral knee medial compartment pain, medial compartment osteoarthritis, and some patellofemoral arthritis. (*Id.*) Dr. Khazzam recommended a medial off-loader brace, Euflexxa injections, and physical therapy appointments. He noted that she did not need to be seen in the orthopedic sports clinic, but needed to follow-up with the orthopedic B clinic. (*Id.*) Plaintiff stated that she wanted to try the brace before proceeding with the Euflexxa injections. (*Id.*)

On January 30, 2012, Nina Nuangchamnong, M.D., at Parkland saw Plaintiff for a follow-up appointment. (R. at 515.) Plaintiff was previously seen at the Lakewest Clinic for abnormal uterine bleeding in July 2011. (*Id.*) She had no complaints this day. (*Id.*) Plaintiff's blood pressure was 141/94, and she weighed 234 pounds with her BMI at 44.21. (*Id.*)

On February 8, 2012, Plaintiff received a left hinged knee brace from Parkland. (R. at 513.) An orthopedic technician, Caroline Johnson, instructed her to wear the brace when she was active, and to remove it at bedtime. (*Id.*)

On February 23, 2012, Dr. Ghayas saw Plaintiff at Parkland for a follow-up appointment.

(R. at 508-10.)  Plaintiff had no complaints and denied any side effects of her medication.  (R. at 508.)  Her blood pressure was high, but she had not taken her medication that day.  (*Id.*)  Her systems were normal, but she had back and joint pain.  (R. at 510.)  A physical exam was normal.  (*Id.*)  Dr. Ghayas's assessment was unspecified essential hypertension, left knee pain, and degenerative joint disease.  (*Id.*)  At Plaintiff's request, Dr. Ghayas wrote a letter to her landlord asking that she be moved to a downstairs unit because it was "getting difficult for her to climb stairs.  (R. at 477, 510.)

On April 5, 2012, Plaintiff saw Shanan Richard, a physical therapist, at Parkland.  (R. at 502.)  Ms. Richard noted that Plaintiff had not been able to make her physical therapy appointments due to lack of transportation, and her missed visits were a barrier to her progress.  (R. at 503-04.)  She still suffered from "a great deal of knee pain" and had fallen several times at home because her knees gave way.  (*Id.*)  Since starting the physical therapy, however, she had gained strength and range of motion.  (*Id.*)  Ms. Richard observed that Plaintiff continued to wear flat, unsupportive shoes despite receiving a pair of tennis shoes with medial support at her last appointment.  (R. at 503, 505.)

On April 11, 2012, Plaintiff had physical therapy at Parkland.  (R. at 500.)  The physical therapist noted decreased lower extremity range of motion and gait impairment.  (R. at 500-01.)  Plaintiff had plateaued, but she had experienced an increase in strength and range of motion since beginning physical therapy.  (R. at 500.)  Plaintiff was discharged because she had plateaued.  (*Id.*)

On April 24, 2012, Stephanie Baker, M.D., an orthopedic doctor at Parkland, saw Plaintiff for Euflexxa injections in her knees.  (R. at 495.)  Plaintiff tolerated the injections well.  (*Id.*)

On the same day, Frank Gottshaulk, M.D., examined Plaintiff at Parkland.  (R. at 497-99.)

9

Plaintiff had previously been to the Parkland clinic for her bilateral knee pain and received steroid injections. (R. at 497.) She reported that the injections gave her relief for a couple weeks. (*Id.*) Plaintiff had been going to physical therapy, which helped a little, but the pain had returned "to a significant degree." (*Id.*) The pain caused her to move to an apartment downstairs because she was unable to go upstairs. (*Id.*) Plaintiff's blood pressure was 163/98. (R. at 498.) Dr. Gottshaulk found tenderness along Plaintiff's medial and lateral joint line and a very small knee effusion on her left knee. (*Id.*) Plaintiff's X-rays showed "bilateral varus knee with medial joint space narrowing" and evidence of "patellofemoral joint disease . . . noted to be worse in the left knee[.]" (*Id.*) Dr. Gottshaulk concluded that ultimately, Plaintiff would need total knee replacement. (*Id.*) He advised Plaintiff that it would be important for her to lose weight through diet and exercise to relieve some of her pain, and also to reduce the BMI to a desirable level for total joint replacement surgery. (*Id.*)

On May 1, 2012, Plaintiff saw Gregory Naugher, M.D., at Parkland for Euflexxa injections. (R. at 491-92.) She reported that the constant throbbing pain in her knees was decreasing, but the pain had not resolved. (R. at 492.) Plaintiff was ambulating without an assistive device and had started doing low impact exercises for weight loss. (*Id.*) Her blood pressure was 156/98, she weighed 230 pounds, and her BMI was at 43.46. (*Id.*) The Euflexxa injections were well tolerated without complications. (*Id.*)

On May 9, 2012, William Hotchkiss, M.D., at Parkland saw Plaintiff. (R. at 489-90.) Plaintiff was returning to the orthopedic clinic for the last Euflexxa injections. (R. at 490.) She reported continued improvements; she was ambulating without an assistive device, and she had begun doing low impact exercises for weight loss. (*Id.*) Plaintiff's blood pressure was 155/95, she weighed 230 pounds, and her BMI was at 43.46. (*Id.*) The last injection was administered to both

of her knees, and the procedure was well tolerated.  (R. at 489.)  Plaintiff was instructed to return if she had a fever, increased swelling, persistent pain in the joint, or if her symptoms did not improve.  (*Id.*)

On June 28, 2012, Plaintiff saw Dr. Ghayas at Parkland for another follow-up appointment for hypertension.  (R. at 486.)  She had no complaints and denied any side effects from her medication.  (*Id.*)  Her blood pressure was high, but she had not been taking Losartan.  (*Id.*)  Plaintiff also noted that she had chronic knee pain, and a knee injection from an orthopedic doctor did not help.  (*Id.*)  She wanted to start on Hydrocodone as needed.  (*Id.*)  Her systems were positive for joint pain.  (R. at 488.)  A physical exam was normal.  (*Id.*)  Dr. Ghayas's assessment was unspecified essential hypertension and chronic knee pain.  (*Id.*)

On July 31, 2012, Plaintiff's left knee was X-rayed at Parkland.  (R. at 537.)  Geral Dietz, M.D., read her scan and observed "tricompartmental osteoarthritis with moderately severe joint space narrowing of the medial compartment[.]"  (*Id.*)

On the same day, Grant Hogue, M.D., at Parkland orthopedic B clinic saw Plaintiff.  (R. at 536.)  Plaintiff's blood pressure was 144/83, and she weighed 243 pounds with her BMI at 45.91.  (*Id.*)  He noted the X-ray reading that showed bilateral medial compartment narrowing.  (*Id.*)  Dr. Hogue determined that Plaintiff was not a candidate for arthroplasty due to her weight.  (*Id.*)  He recommended that she "continue conservative therapy and weight loss" and come back when her BMI was below 40.  (*Id.*)

On August 14, 2012, Cheryl Lopez, O.D., at Parkland saw Plaintiff for an eye exam.  (R. at 533-34.)  Plaintiff complained of hypertension and blurred vision.  (R. at 534.)  Dr. Lopez's assessment was blurred vision and hypertensive retinopathy, mild.  (*Id.*)  She released Plaintiff's lens

script and recommended continued care with her primary care physician for "tight blood pressure control." (*Id.*)

### 3.    Hearing Testimony

On August 20, 2012, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (R. at 21-73.)  Plaintiff was represented by an attorney.  (R. at 21, 23.)

#### a.    *Plaintiff's Testimony*

Plaintiff testified that she had worked at a school cafeteria with the Dallas Independent School District as a cook and a line server beginning in 1997.  (R. at 36-37.)  In 2001, she worked as a cook assistant for Integrated Living, an assisted living facility.  (R. at 38.)  In 2007 and 2008, she went back to work at the same assisted living facility.  (R. at 39.)  She was terminated from the position in 2009 because she missed too many workdays due to her son's murder and her hypertension.  (R. at 40-41.)  In 2010, she worked for Johnson Food Court at the Texas fair.  (R. at 41.)  Plaintiff testified that hypertension and degenerative knee conditions prevented her from going back to work.  (*Id.*)

Plaintiff suffered from degenerative joint disease in both of her knees.  (R. at 41-42.)  The problem first arose in 2009 with her right knee, but now both knees were in pain, and her left knee was worse than the right knee.  (R. at 42, 50.)  Doctors progressively prescribed medications for her pain, beginning with Ibuprofen, then Tramadol, and most recently, 30 pills of Hydrocodone for her to take as needed.  (R. at 42-44, 58.)  They also had her in braces for her knee, then referred her to physical therapy.  (R. at 44.)  The physical therapy provided some relief, but she could not go to every session because she had no car and no money for public transportation.  (R. at 44-45.)  Plaintiff also received three Euflexxa injections, but they helped for only two weeks.  (R. at 46-47.)

Her left knee pain was constant, whether sitting, walking or lying down.  (R. at 49.)  Plaintiff suffered constant pain in her right knee as well, but she did receive some relief when she was lying down.  (*Id.*)  On a scale of zero to 10, the pain in her left knee was at six, and the right knee was at five on an average day.  (R. at 50-51.)  Her pain got worse when she walked "a long ways" and stood for a long period.  (R. at 51.)  Plaintiff showered because she could not sit down flat in a bathtub.  (R. at 51-52.)  She could not kneel, and it had been over a year since she was able to crawl, crouch, or kneel.  (R. at 52.)  The only time she found relief from her knee pain was when she was laying down, with something propping her knees up.  (R. at 53.)  Plaintiff could walk about a block before her knee pain caused her to stop.  (R. at 53-54.)  She could stand for fifteen minutes and sit, at most, half an hour.  (R. at 54.)  In the past 14 months, she spent six hours between 8:00 a.m. and 5:00 p.m., lying down.  (R. at 55.)

Plaintiff had recently visited Parkland, but the visit was not in the record.  (R. at 52.)  Her doctor was going to put her on the waiting list for surgery on her left knee and wanted her to lose weight.  (R. at 53.)

Plaintiff took three blood pressure medications.  (R. at 58-59.)  Two of the blood pressure medicines made her dizzy for two to three hours.  (R. at 60-61.)  Her dizziness, however, was not to the point of losing balance, and she had not fallen from it.  (R. at 62.)

Plaintiff lived alone in an apartment, but her adult daughter and sister helped her 90 percent of the time.  (R. at 55.)  She normally used a microwave to heat up food, or her sister helped cook a meal.  (R. at 57.)  Plaintiff had six grandchildren; she sometimes babysat them for short periods of time.  (R. at 57-58.)

### b.      VE's Testimony

The VE classified Plaintiff's past relevant work as cafeteria counter attendant, cafeteria cook, and food service worker.  (R. at 64-65.)  The ALJ asked the VE to opine whether there were jobs in the State of Texas and national economies for a hypothetical younger individual with limited education who could speak English and had Plaintiff's work history with the following RFC: lift up to 10 pounds frequently, walk/stand no more than two hours during the day, 15 to 20 minutes at a time; climb ladders, ropes, or scaffolds occasionally or less; avoid steps, kneel, crawl, crouch, and squat occasionally; any knee intensive activities only occasionally or less; and must work in climate-controlled environment free of the extremes of temperature, humidity, excessive smoke, fumes, or particulates.  (R. at 65-66.)  The hypothetical individual could only do a restricted range of sedentary work.  (R. at 65.)  The VE answered in the affirmative and listed the following examples of sedentary jobs: (1) final assembler, sedentary, DOT 209.567-014, 106,000 available nationally and 6,400 available in Texas; (2) order clerk, sedentary, DOT 209.567-014, 24,300 available nationally and 1,600 in Texas; and (3) addresser, sedentary, DOT 209.587-010, 24,000 available nationally and 2,200 in Texas.  (R. at 66-67.)  The VE testified that the maximum tolerance for absences was once or twice a month.  (R. at 67.)  The maximum tolerance for going off-task was five minutes each hour outside of the regularly scheduled breaks.  (R. at 67.)  All of the work needed to be performed eight hours per day or for the equivalent of a 40-hour week.  (R. at 67.)

## C.      ALJ's Findings

The ALJ issued her decision denying benefits on September 11, 2012. (R. at 7-16.)  At step one, she found that Plaintiff had not engaged in substantial gainful activity since June 16, 2011, the application date.  (R. at 12.)  At step two, she found that Plaintiff had four severe impairments:

"degenerative joint disease of the knees, hypertension, obesity and intermittent asthma." (*Id.*) Despite those impairments, at step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any impairment listed in the regulations. (*Id.*)

Before proceeding to step four, the ALJ determined that Plaintiff had the following RFC: stand and/or walk two hours in an eight-hour day for no more than 15 to 20 minutes at a time; never climb ropes, ladders, or scaffolds; occasionally climb ramps or stairs; occasionally kneel, crawl, and crouch; and work in a climate controlled environment free of excessive dust, fumes, and smoke. (R. at 13.) At step four, the ALJ determined that Plaintiff could not perform her past relevant work. (R. at 15.) At step five, the ALJ determined that the Medical-Vocational Rules "directly support[ed] a finding of 'not disabled[.]'" (*Id.*) The ALJ found that even if Medical-Vocational Rule 201.25 did not direct a finding, Plaintiff could perform other jobs existing in significant numbers in the national economy, such as final assembler, order clerk, or addresser, based on the VE's testimony. (R. at 16.) Accordingly, the ALJ concluded that Plaintiff was not disabled as the term is defined under the Social Security Act, at any time since her date of application. (*Id.*)

## II. ANALYSIS

### A.   <u>Legal Standards</u>

#### 1.   **Standard of Review**

Judicial review of the commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(c)(3). Substantial evidence is defined as more than a

scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See Id.* The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *Id.*

**2.       Disability Determination**

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 189, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.   An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.   An individual who does not have a "severe impairment" will not be found to be disabled.

3.   An individual who "meets or equals a listed impairment in Appendix 1" will not be found to be disabled.

4.   If an individual is capable of performing the work he had done in the past, a finding of "not disabled" must be made.

5.   If an individual's impairment precludes him from performing his work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)).  Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony or other similar evidence. *Froga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

B.      **Issues for Review**

Plaintiff presents four issues for review:

(1) (a) Did the ALJ properly consider [Plaintiff's] hypertensive retinopathy, which caused her to have "blurred vision near and far" in both eyes?; (b) did the ALJ properly consider [Plaintiff's] recurrent headaches and what those may portend about the severity of her degenerative eye disease?; and (c) is the ALJ's finding that [Plaintiff's] hypertension is "well controlled on her current treatment regimen" supported by substantial evidence?

(2) Did the ALJ use the correct definition of RFC?  In insisting that [Plaintiff] testify only about her symptoms on "average days" and keep quiet about her "bad days"–did the ALJ breach her duty to develop the record fully and fairly?  In particular, did she unfairly minimize evidence of symptom flare-ups that would contribute to excess absenteeism or otherwise create difficulty sustaining work activities for 8 hours per day, 40 hours per week, "on a regular and continuing basis," SSR 96-8p?

(3) In rejecting the State-agency RFC opinion–the only medical opinion that attempted to estimate the effect of [Plaintiff's] ailments on her ability to work–without ordering a consultative examination or otherwise bringing medical expertise to bear on the what the most recent imaging studies and medical findings imply about [Plaintiff's] ability to do work activity, did the ALJ violate the rule of *Ripley v. Chater*?

(4) Did the ALJ evaluate the interaction between [Plaintiff's] extreme obesity and her arthritic knees with enough care and specificity to permit meaningful review?

C.      **Severe Impairments**

Plaintiff argues that the ALJ erred when she found that Plaintiff's blood pressure, her

hypertensive retinopahthy, and headaches were not severe.  (Doc. 24 at 10-14.)

A severe impairment is "any impairment or combination of impairments which significantly

limits [the claimant's] physical or mental ability to do basic work activities."   20 C.F.R. §

404.152(c).   The Fifth Circuit has held that a literal application of this regulation would be

inconsistent with the Social Security Act because the regulation includes fewer conditions than

indicated by the statute.   *Stone v. Heckler*, 752 F.2d 1099, 1104–05 (5th Cir.1985).   In the Fifth

Circuit, an impairment is not severe "only if it is a slight abnormality [having] such minimal effect

18

on the individual that it would not be expected to interfere with the individual's ability to work." *Id.* at 1101.[3]   Further, the determination of severity may not be "made without regard to the individual's ability to perform substantial gainful activity."  *Id.* at 1104.  The claimant also has to demonstrate that the severe impairment is expected to last for at least 12 months.  *See* 42 U.S.C. § 423(d)(1)(A); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  "The existence of such disability must be demonstrated by medically acceptable clinical and laboratory diagnostic findings, and the overall burden of proof rests upon the claimant."  *Cook*, 750 F.2d at 393.

### 1.    Hypertension

Plaintiff argues that the ALJ erred when she found that Plaintiff's blood pressure was not severe, but "well-controlled on her current treatment regimen of Losartan, Metoprolol and other medications[.]"  (Doc. 24 at 10-11.)

"The mere presence of some impairment is not disabling per se."  *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983).  The disability claimant is required to show that "she was so functionally impaired by her [impairment] that she was precluded from engaging in any substantial gainful activity."  *Id.*  The Fifth Circuit has repeatedly ruled that "[i]f an impairment reasonably can be remedied or controlled by medication or therapy, it cannot serve as a basis for a finding of disability."  *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988), citing 20 C.F.R. §§ 404.1530, 416.930, and *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987); *see also Bolton v. Apfel*, 237 F.3d 632, at *1 (5th Cir. 2000) (unpublished); *Stein v. Shalala*, 22 F.3d 1093, at *3 (5th Cir. 1994) (unpublished).  When there is persuasive evidence that an impairment reasonably can be remedied by treatment, a claimant cannot claim disability on the basis of the impairment.  *Stillwell v. Cohen*,

---

[3]  Plaintiff does not argue that the ALJ failed to apply the correct standard under *Stone*.  (Doc. 24 at 10-14.)

411 F.2d 574, 575-76 (5th Cir. 1969) (finding that there was persuasive evidence that the claimant could improve his condition by losing weight and returning to work).

Here, the ALJ found that based on Plaintiff's medical records, her hypertension was well controlled on her treatment regimen. (R. at 14.) She mainly relied on Plaintiff's June 28, 2012 visit to Dr. Ghayas, her primary care physician, to whom Plaintiff reported that she had "no complaints" related to her hypertension and denied any side effects of the medication she was taking for it. (R. at 14, 486.) The ALJ also noted that her physical examination revealed normal cardiovascular and pulmonary findings, and although Plaintiff was diagnosed with unspecified essential hypertension, there was no discussion of any physical limitations she had due to the condition. (R. at 14.)

Plaintiff's medical records show that hypertension was specifically discussed during only three out of 14 doctor's visits within the relevant time period. (*See* R. at 467-68, 486, 508.) On August 10, 1011, Plaintiff had high blood pressure, and Dr. Ghayas added one more blood pressure medication. (R. at 467-68.) Subsequently, Plaintiff reported to Dr. Ghayas that she had no complaints and had no side effects from her medication.[4] (R. at 486, 508.) Plaintiff's respiratory, cardiovascular, and pulmonary systems were normal at all times. (R. at 467-68, 488, 510.) Her medical records, therefore, show that under her current medication regime, her hypertension was under control. (R. at 467-68, 486, 488, 508, 510.) The ALJ did not err when she found that Plaintiff's hypertension was well controlled by her medication. *See Johnson*, 864 F.2d at 348; *Stillwell*, 411 F.2d at 575-76; *see also Martinez v. Astrue*, No. 7:09-cv-125-O, 2010 WL 1946626 at *3 (N.D. Tex. Mar. 30, 2010) (affirming the Commissioner's decision, the court noted that the medical record showed that the claimant's diabetes and hypertension could easily be controlled by

---

[4] Plaintiff's blood pressure was high on both days, but she had not taken her medication. (R. at 486, 508.)

medication); *Lovelace*, 813 F.2d at 59 (noting that a medical impairment that can reasonably be controlled by medication, surgery, or treatment is not disabling).

Plaintiff argues that her doctors repeatedly noted that her blood pressure was not controlled and was abnormal, but only one of the three medical records she cites falls within the relevant time period of June 16, 2011 through September 11, 2012.[5] (Doc. 24 at 10 (citing to the medical records related to Plaintiff's visit to Parkland on September 13, 2010, Baylor on March 23, 2011, and Parkland on August 10, 2011).)  There, Dr. Ghayas observed that Plaintiff's blood pressure was high, but she had no chest pain, shortness of breath, or palpitations.  (R. at 467.)  Plaintiff also had no blurred vision or double vision, no respiratory difficulties, no headaches, and no cardiovascular difficulties.  (R. at 467-68.)  Dr. Ghayas added Losartan to Plaintiff's medication regimen and instructed her to keep a log of her blood pressure; he did not note that Plaintiff's hypertension was in severe condition.  (*Id.*)  The medical records during the relevant period do not show that Plaintiff's doctors repeatedly found her hypertension uncontrolled.

Plaintiff also lists 14 blood pressure readings and asserts that none of her blood pressure readings had been "in either the normal or the 'prehypertensive' range of 120-139/80-89."  (Doc. 24 at 10 (citing to a Mayo Clinic blood pressure chart), at 11 (listing the blood pressure records from November 14, 2009, June 9, 2010, September 13, 2010, February 11, 2011, February 19, 2011,

---

[5]  Under Title XVI, a "claimant cannot receive payment for [SSI] for any time prior to the application [date], regardless of the length of the disability."  *Slaughter v. Astrue*, 857 F.Supp.2d 631, 635 n. 42 (S.D. Tex.2012) (citing 20 C.F.R. § 416.335; *Brown v. Apfel*, 192 F.3d 492, 495 n. 1 (5th Cir.1999)).  To qualify for SSI payments, she must show that she was disabled between her application date and the date of the ALJ's decision. *See Plaisance v. Astrue*, CIV.A. 07-8242, 2008 WL 4808852, at *1 (E.D. La. Oct.31, 2008) (explaining that because "the month following an application . . . fixes the earliest date from which benefits can be paid," "the relevant time period for any period of disability is [the application date] through the date of the ALJ's decision") (citations omitted).

March 21, 2011, April 19, 2011, April 25, 2011, June 10, 2011, August 10, 2011,[6] August 31, 2011, January 30, 2012, May 1, 2012, and May 9, 2012).)   Nine of the 14 readings were outside the relevant time period, however.  (*See* doc. 24 at 11.)  The highest blood pressure reading during the relevant period was recorded on August 10, 2011, when Plaintiff's blood pressure was at 189/99. (R. at 467.)  Once her doctor added Losartan into her medication regimen, however, the subsequent four blood pressure readings remained lower, and none of the doctors recommended any additional treatment for hypertension.  (*See* doc. 24 at 11 (noting the blood pressure readings of 155/97 on August 31, 2011, 141/94 on January 30, 2012, 156/98 on May 1, 2012, and 155/95 on May 9, 2012); R. at 453, 490, 492, 515.)  The doctors also did not note any significant restrictions on normal functions due to hypertension on all five occasions.  (*See* R. at 453, 467-68, 490, 492, 515.)

It is Plaintiff's burden to show that her hypertension so functionally impaired her that she was precluded from engaging in any substantial gainful activity.  *See Hames*, 707 F.2d at 165; *Coleman-Rose v. Astrue*, No. 4:09-CV-00617-A, 2011 WL 208421 at * 4 (N.D. Tex. Jan. 4, 2011) (stating that the claimant "must demonstrate that she 'was so functionally impaired' by her hypertension 'that she was precluded from engaging in any substantial gainful activity.'") *rec. adopted*, No. 4:09-CV-617-A, 2011 WL 208409.  The medical evidence shows that her hypertension was under control, and none of the evidence she cites supports a different conclusion.  Because an impairment that reasonably can be remedied or controlled by medication cannot serve as a basis for a finding of disability, the ALJ did not err in her finding.

---

[6] It appears that Plaintiff identified the August 10, 2011 record as being from October 3, 2011.  (*See* doc. 24 at 11.)

### 2.     Hypertensive Retinopathy

Plaintiff next argues that a new medical record dated August 14, 2012 that contains a diagnosis of hypertensive retinopathy was incorporated into the record after the ALJ's decision, and the failure to find the condition to be a severe impairment was error and merits remand.  (Doc. 24 at 12-13.)

When a claimant submits new and material evidence that relates to the period before the date of the ALJ's decision, the Appeals Council must consider the evidence in deciding whether to grant a request for review.  20 C.F.R. § 404.970(b).  New evidence submitted to the Appeals Council becomes part of the record upon which the Commissioner's decision is based.  *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir.2005).  A court considering the Appeals Council's decision must review the record as a whole to determine whether the Commissioner's decision is supported by substantial evidence, and should remand only if the new evidence dilutes the record to such an extent that the ALJ's decision becomes unsupported.  *Higginbotham v. Barnhart*, 163 F. App'x 279, 281-82 (5th Cir.2006); *Morton v. Astrue*, No. 3:10-CV-1076-D, 2011 WL 2455566, at *7 (N.D. Tex. June 20, 2011) (Fitzwater, C.J.) ("The proper inquiry concerning new evidence takes place in the district court, which considers whether, in light of the new evidence, the Commissioner's findings are still supported by substantial evidence.") (citations omitted).

In this case, the ALJ found no limitation related to Plaintiff's vision.  Her medical records consistently showed no difficulties.  (R. at 467 (finding negative for blurred or double vision on August 10, 2011); at 508-10 (finding negative for vision issues on February 23, 2012); at 486-88 (finding negative for vision issues on June 29, 2012).)  In fact, because she did not have any vision issues, she had not seen an optometrist for ten years prior to her August 14, 2012 appointment.  (R.

at 535.)  The optometrist diagnosed Plaintiff with hypertensive retinopathy, but found the condition

to be mild.  (R. at 534.)  The report noted no physical limitations that Plaintiff suffered (work related

or otherwise) and no recommendation for a separate treatment for the condition; it provided

Plaintiff's lens prescription and recommended continued treatment of hypertension.  (*Id.*)  Plaintiff

also never claimed to have any vision issues at any point during the administrative process.  (R. at

5-6, 23-73, 183, 195, 212.)  She did not mention the August 14, 2012 hypertensive retinopathy

diagnosis at the August 20, 2012 administrative hearing, even though her appointment was only six

days before, but she reported an orthopedic appointment on July 31, 2012.  (*See* R. at 23-73.)

Further, even though Plaintiff submitted the August 14, 2012 record as additional evidence to the

Appeals Council, and the Appeals Council made the evidence part of the record, her actual argument

to the Appeals Council for review was on the issue of obesity and she never mentioned the

hypertensive retinopathy diagnosis.  (*See* R. at 4-6.)

Reviewing the record as a whole, the new evidence did not dilute the record to the extent that

the ALJ's decision became insufficiently supported.  It was not inconsistent with the ALJ's finding

that Plaintiff could perform jobs that existed in significant numbers in the economy.  *See Pope v.

Colvin*, 4:13-CV-473-Y, 2014 WL 1724766, at *5 (N.D. Tex. May 1, 2014) (finding that the new

evidence showing a new diagnosis of macular edema did not dilute the record when there was no

evidence that such impairment impacted the claimant's ability to work); *see also Morton*, 2011 WL

2455566, at *7 (stating that if, "in light of the new evidence, the [ALJ's] findings are still supported

by substantial evidence," the Court must affirm the Commissioner's decision.).

Plaintiff argues that her hypertensive retinopathy should have been considered as a severe

condition at step two, when the ALJ assessed her RFC, and that at the very least, the new evidence

merits further medical development.  (Doc. 24 at 13-14.)  The Fifth Circuit has ruled that although the ALJ has a duty to develop facts fully and fairly, it "does not extend to possible disabilities that are not alleged by the claimant or to those disabilities that are not clearly indicated on the record." *Leggett*, 67 F.3d at 566 (noting that the claimant failed to allege mental impairments in his application or before the ALJ). As discussed, Plaintiff failed to raise the issue of hypertensive retinopathy before the ALJ or the Appeals Council even though she was diagnosed with the condition six days before the administrative hearing.  (R. at 23-73, 534.)  The ALJ considered the medical records, which specifically found no vision problems.  (R. at 467, 486-88, 508-10.)  Even the optometrist who diagnosed Plaintiff with hypertensive retinopathy stated that the condition was mild, and did not recommend any treatment for the condition.  (R. at 534.)  Further, Plaintiff points to no evidence showing that hypertensive retinopathy affected her ability to work.  The ALJ's failure to consider hypertensive retinopathy, therefore, was not an error that merits remand.  *See Sweeten v. Astrue*, No. 3:11–CV0934–G–BH, 2012 WL 3731081 (N.D. Tex. Aug. 13, 2012) (finding no error in the ALJ's failure to consider anxiety as a severe impairment where the plaintiff failed to claim anxiety as an impairment before the ALJ, the medical records showed only an occasional display of symptoms, and she never sought treatment for anxiety); *cf. Dominigue v. Barnhart*, 388 F.3d 462, 463 (5th Cir. 2004) (per curiam) (affirming the ALJ's conclusion that the claimant's depression "was no impairment at all[,]" where "[a]t the administrative level [the claimant] did not contend that depression was an impairment, and, in the courts, she pointed to no evidence indicating that her alleged depression affected her ability to work.").

### 3. Headaches

Plaintiff also argues that the ALJ erred when she failed to consider her headaches as a severe

impairment.  (Doc. 24 at 15.)  She raises this issue for the first time on appeal.  (Doc. 24 at 15.)

As noted, the claimant has the burden of proving her disability, "and the ALJ has a duty to fully develop facts, or else the decision is not supported by substantial evidence.  The ALJ's duty to investigate, though, "does not extend to possible disabilities that are not alleged by the claimant or to those disabilities that are not clearly indicated on the record."  *Leggett*, 67 F.3d at 566; *see Sweeten*, 2012 WL 3731081.  "Consequently, when [the] claimant fails to raise the issue of a particular cause for disability before seeking review in the district court, [she] cannot say that [she] put the issue before the ALJ or that the ALJ improperly disregarded it."  *Viltz v. Astrue*, No. 6:10-CV-00231, 2011 WL 4479578, at *6 (W.D. La. Aug. 18, 2011).

The ALJ did not make any finding related to headaches in her decision.  (R. at 10-16.)  None of the medical records to which Plaintiff now cites fall in the relevant time period.  (*See* doc. 24 at 15 (citing to records from November 14, 2008 (R. at 370, 372, 375), November 24, 2010 (R. at 244-45), March 21, 2011 (R. at 236), and June 10, 2011 (R. at 337)).)  In fact, Plaintiff reported to her doctor that she was not suffering from headaches.  (R. at 467.)

Because her medical records lack any evidence that she suffered from headaches during the relevant time period, and she failed to raise headaches as an impairment before the ALJ or the Appeals Council, Plaintiff did not properly present the issue of headaches before the ALJ.  *See Gore v. Barnhart*, 54 F. App'x 406, at *1 (5th Cir. Oct. 29, 2002) (per curiam) (unpublished) (finding that all issues related to obesity was moot and stated that "[b]ecause [the claimant] did not raise the issue of obesity until she sought review in the district court, and a definitive diagnosis was made by only a single physician before her alleged onset date, she did not properly put the issue before the ALJ").  The ALJ's failure to find Plaintiff's headaches to be a severe impairment, therefore, was not an error

and remand is not required.[7] *Gonzales v. Astrue*, 231 F. App'x. 322, 324 (5th Cir.2007) (per curiam) (holding that ALJ had no obligation to investigate learning impairment when the record contained no evidence of such); *Ranes v. Astrue*, No. 3:08-CV-2030-D, 2009 WL 2486037, at *4 (N.D.Tex. Aug.14, 2009) (Fitzwater, C.J.) (upholding ALJ's determination of no disability when there was no testimony at hearing and record contained no evidence of mental impairment).

## D.  RFC Definition

Plaintiff asserts that by asking her to testify only about her "average days", the ALJ used a definition of RFC that is contrary to law and "violated her duty to investigate the facts and develop the arguments . . . for granting benefits."  (Doc. 24 at 15-18.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations.  20 C.F.R. § 404.1545(a)(1) (2003).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir.1985).  The ALJ may find that a claimant has no limitation or restriction as to functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no

---

[7] Plaintiff also seems to assert that the headaches are the evidence that her hypertension is severe.  (Doc. 24 at 14-15.)  As noted, all of the evidence she cites that mentioned headaches occurred prior to the relevant time period.  (See id. at 15.)  Further, there is no evidence connecting hypertension to her headaches.

information in the record indicates that such a limitation or restriction exists.  *See* SSR 96–8p, 1996 WL 374184, at *1.  The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected.  *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir.1994).  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record.  *Leggett*, 67 F.3d at 564.  Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings."  *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir.1984) (citations omitted).  Courts "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision.  *Id.*  They may not reweigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence[.]"  *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, ALJ asked Plaintiff to testify about her symptoms on "average days," when Plaintiff was "doing everything [she] could to follow [her] doctor's instructions."  (R. at 47-48, 50, 53, 55.) The ALJ's decision discussed Plaintiff's complaints and her medical records relating to her chronic knee pain, asthma, hypertension, and obesity, as well as her testimony that she could stand for 15 minutes at a time into her RFC assessment.  (R. at 13-14, 54.)  It also noted the discrepancies between Plaintiff's testimony that she suffered from the side effects of the hypertension medications, and her report to her primary care physician that she suffered no side effects, and between Plaintiff's testimony that steroid injections on her knees were ineffective and her report to her doctors that she saw improvements.  (R. at 14.)  It noted that Plaintiff shopped for groceries and cared for her

grandchildren, which conflicted with the limitations to which she testified.  (R. at 14-15.)  After

making a credibility determination regarding Plaintiff's alleged symptoms and limitations, and

evaluating all the evidence of record, the ALJ determined that Plaintiff had the RFC to perform a

reduced range of sedentary work with the following limitations: "stand and/or walk 2 hours in an

8-hour day for no more than 15-20 minutes at a time.  [Plaintiff] can never climb ropes, ladders, or

scaffolds and can only occasionally climb ramps or stairs.  [Plaintiff] can occasionally kneel, crawl

and crouch.  [Plaintiff] can only work in a climate controlled environment free of excessive dust,

fumes and smoke."  (R. at 13.)

Plaintiff alleges that by asking her to testify about her average days only, and not her bad

days, the ALJ skewed her testimony and used an incorrect definition of RFC.  (Doc. 24 at 17; Doc.

28 at 1-2.[8])  Plaintiff does not cite any authority in support of this contention, and she has not shown

that the question was improper.  When the ALJ asked Plaintiff to testify about her average days, she

asked about days where [Plaintiff was] doing everything [she] could to follow [her] doctor's

instructions", including taking her medications and following instructions.  (R. at 48, 50.)  In order

to be considered for benefits, a claimant is required to "follow treatment prescribed by [the

claimant's] physician . . . [and i]f the claimant do[es] not follow the prescribed treatment without

a good reason," then the claimant would not qualify for the benefits.  20 C.F.R. §§ 404.1530(a)&(b),

416.930.  Testimony about a plaintiff's activities on an average day is not unique to this case.  *See*

*Owen v. Astrue*, 4:10cv476-Y, 2011 WL 3348064, at *5 (N.D. Tex. May 12, 2011) (plaintiff testified

to his activities on "an average day"); *Johnson v. Astrue*, H-10-422, 2010 WL 5437262, at *12

---

[8]  Plaintiff filed a "corrected" reply brief on May 4, 2014, and then an amended reply brief on May 7, 2014, allegedly in the interest of submitting a shorter brief.  (*See* docs. 29 at 1; 30 at 1.)  Only the original reply brief that was submitted by the May 2, 2014 deadline has been considered.

(S.D.Tex. Dec. 27, 2010) (same); *Alvarado v. Astrue*, 5:09–CV–242–BG, 2010 WL 3000766, at *3 (N.D. Tex. Jul. 1, 2010) (same).

Further, the ALJ did not rely solely on Plaintiff's testimony regarding the "average days" to determine her RFC.  She considered all of the evidence before her and fully developed facts based on the objective medical records, both on the days when Plaintiff's condition was less than average, such as when she visited an ER, and on average days.  (R. at 13-15.)   She incorporated all of the evidence before her, addressing the records related to Plaintiff's degenerative knee condition, asthma, hypertension, and obesity.  (R. at 13-14.)  She also resolved any discrepancy between Plaintiff's testimony and medical evidence.  (*Id.*)

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez*, 777 F.2d at 302.  As the fact-finder, the ALJ also had the sole responsibility for deciding whether the opinions were supported by the record.  *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir.1991) (per curiam); *see also Newton*, 209 F.3d at 452 ("Conflicts in the evidence are for the [ALJ] . . . to resolve.")  Substantial evidence supports the ALJ's RFC determination, and remand is not required on this issue.  *See Johnson*, 864 F.2d at 343 (stating that courts may not reweigh the evidence or substitute their judgment for that of the Commissioner and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence[.]" (citations omitted)).

E.      **RFC Determination: *Ripley* Error**

Plaintiff argues that because the ALJ rejected the only medical opinion in the record concerning the effect of her medical conditions on her ability to work and did not bring in other medical expertise on that issue, she violated the rule of *Ripley v. Chater*, 67 F.3d 552 (5th Cir.

30

1995).  (Doc. 24 at 19-23.)

In *Ripley*, the claimant argued that the ALJ failed to develop the record fully and fairly by finding that he could perform sedentary work even though there was no medical testimony to support that conclusion.  67 F.3d at 557.  The Fifth Circuit noted that although an ALJ should usually request a medical source statement describing the types of work that the applicant was still capable of performing", the absence of such a statement did not necessarily make the record incomplete.  *Id.*  Rather, the court had to consider whether there was substantial evidence in the record to support the ALJ's decision.  *Id.*  The record contained "a vast amount of medical evidence" establishing that the claimant had a back problem, but it did not clearly establish the effect of that problem on his ability to work.  *Id.*  The ALJ's RFC determination was therefore not supported by substantial evidence, so the Fifth Circuit remanded the case with instructions to the ALJ to obtain a report from a treating physician.  *Id.* at 557-58.  Notably, the Fifth Circuit rejected the Commissioner's argument that the medical evidence discussing the extent of the claimant's impairment substantially supported the ALJ's RFC assessment, finding that it was unable to determine the effects of the claimant's condition on his ability to work absent reports from qualified medical experts.  *Id.* at 558 n.27.

Here, two SAMCs opined that Plaintiff could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and/or walk about six hours in an eight hour workday, sit for a total of about six hours in an eight-hour workday, and push and pull with no limitations.  (R. at 328, 366.)  In determining the RFC, the ALJ expressly gave little weight to these opinions because she found that Plaintiff was "more limited than determined by the State Agency."  (R. at 15.)  She gave some weight to letter from Plaintiff's primary care physician asking that she be moved to a first

31

floor apartment unit because she had difficulty climbing stairs. (R. at 15, 477.) The ALJ determined that Plaintiff had the RFC to perform a reduced range of sedentary work with the following limitations: "stand and/or walk 2 hours in an 8-hour day for no more than 15-20 minutes at a time. [Plaintiff] can never climb ropes, ladders, or scaffolds and can only occasionally climb ramps or stairs. [Plaintiff] can occasionally kneel, crawl and crouch. [Plaintiff] can only work in a climate controlled environment free of excessive dust, fumes and smoke." (R. at 13.) The ALJ did not request a medical source statement that described the type of work that Plaintiff could still perform. The medical records indicate the progressively worsening condition of Plaintiff's knees, but they do not address what effect her chronic knee pain had on her ability to work. (R. at 435, 498, 518, 537.)

While the ALJ may choose to reject an SAMC's opinion, "[s]he cannot independently decide the effects of Plaintiff's . . . impairments on [her] ability to work, as that is expressly prohibited by *Ripley*." *Shugart v. Astrue*, No. 3:12-CV-1705-BK, 2013 WL 991252, at *5 (N.D. Tex. Mar. 13, 2013). Here, even assuming the letter by Plaintiff's primary care physician relates to her ability to work, it was limited only to Plaintiff's ability to climb stairs, and the ALJ gave it only some weight. (R. at 15, 477.) There were no medical opinions regarding the effects Plaintiff's impairments had on her ability to work, particularly in the area of standing, walking, or the ability to kneel, crawl, or crouch. The only evidence of Plaintiff's ability to stand, walk, kneel, crawl, or crouch came from Plaintiff's testimony that she could not kneel, crawl, or crouch. *Williams v. Astrue*, 355 F. App'x 828, 831 (5th Cir. 2009) (finding that there was no evidence "supporting the ALJ's finding that [the claimant] can stand or walk for six hours in an eight-hour workday."). The ALJ therefore appears to have relied on her own opinion, which she may not do. *See id.* at 832 n.6 ("An ALJ may

not–without the opinions from medical experts–derive the applicant's residual functional capacity based solely on the evidence of his or her claimed medical conditions, [and] an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions."). Consequently, substantial evidence does not support the ALJ's RFC determination. *Id.* at 832 (finding the RFC determination was not supported by substantial evidence because the ALJ rejected the opinions of the claimant's treating physicians and relied on his own medical opinions as to the limitations presented by the claimant's back problems); *Lagrone v. Colvin*, No. 4:12–CV–792–Y, 2013 WL 6157164, at *6 (N.D.Tex. Nov.22, 2013) (finding substantial evidence did not support the ALJ's RFC determination where the ALJ rejected all medical opinions in the record that might explain the effects of the claimant's physical impairments on his ability to perform work and there were no such opinions as to claimant's mental impairments).

The Commissioner contends that the ALJ's RFC finding was supported by substantial evidence despite the absence of a medical source statement. (Doc. 25 at 15.) She notes that in May 2012, Plaintiff reported continued improvement in her knee pain, and she was ambulating without an assistive device and performing a low impact exercise regimen. (*Id.*) A physical therapy record reflects that Plaintiff reported improvements since beginning physical therapy. (*Id.*) When she reported improvement in her knee pain, however, Plaintiff was receiving Euflexxa injections that only gave her only a few weeks of relief. (R. at 46-47, 486.) The physical therapy record also showed that Plaintiff's condition had plateaued, and that she could not continue the physical therapy because she lacked access to transportation. (R. 44-45, 500, 503-04.) The Fifth Circuit ruled that when a claimant lacks access to a treatment, "the condition that is disabling in fact continues to be disabling in law." *Lovelace*, 813 F.2d at 59 (quoting *Taylor v. Bowen*, 782 F.2d 1294, 1298 (5th

Cir.1986)).  These reports of improvements after receiving short-term treatments to which Plaintiff

no longer had access do not constitute substantial evidence.

The Commissioner also points to Plaintiff's testimony that she could walk a block, and that

she babysat her grandchildren for short periods of time.  (Doc. 25 at 15.)  Plaintiff also testified that

she could not kneel, crawl, or crouch, that she spent six hours out of a nine-hour day lying down,

and that the only time she found relief from her knee pain was when she was laying down with

something propping her knees up.  (R. at 52-55.)  Plaintiff's testimony does not support the ALJ's

finding that Plaintiff could kneel, crawl, and crouch occasionally.  *See Ripley*, 67 F.3d at 557 n. 28

(finding the only evidence of claimant's ability to work came from the claimant's testimony upon

which the ALJ considered when making his RFC, and although claimant testified that he went to

church, rode in a car, and drove occasionally, the ALJ failed to consider his testimony regarding his

limitations in performing those tasks); *Browning v. Barnhart*, No. 1:01-CV-637, 2003 WL 1831112,

at *7 (E.D. Tex. Feb. 27, 2003) (observing that "[t]he only other evidence from which a[n RFC]

assessment could be made is plaintiff's and her husband's testimony.  Nowhere in the testimony of

either of these witnesses [was] there an evidentiary basis for finding that plaintiff retains [RFC] for

sedentary work as that term is defined in applicable regulations."); *see also Moreno v. Astrue*, No.

5:09-CV-123-BG ECF, 2010 WL 3025525, at *3 (N.D. Tex. June 30, 2010) (finding that the ALJ

impermissibly relied on his own medical opinions when the ALJ found that the claimant could walk

or stand for six hours in an eight-hour workday even though there was "no evidence that was

credited by the ALJ that describe[d] how long [the claimant] could walk or stand.") *rec. adopted*,

2010 WL 3025519 (N.D. Tex. Aug. 3, 2010).

The Fifth Circuit has ruled that "[p]rocedural perfection in administrative proceedings is not

required," however, and a court "will not vacate a judgment unless the substantial rights of a party are affected." *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988) (per curiam).  When an ALJ commits a *Ripley* error, remand "is appropriate only if [Plaintiff] shows that [she] was prejudiced." *Ripley*, 67 F.3d at 557.  "Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision." *Id.* at n. 22.

Here, the evidence before the ALJ showed that Plaintiff had a chronic knee condition that was progressively worsening.  (R. at 435, 498, 518, 537.)  Aside from the letter from Plaintiff's primary care physician to her landlord regarding her difficulty climbing stairs, the ALJ considered no other medical evidence that provided information about the effects of Plaintiff's knee condition on her ability to work.  She also discredited Plaintiff's testimony that she could not kneel, crawl, or crouch, but there was no other evidence that addressed such abilities.  Given the evidence supporting Plaintiff's chronic knee pain that was progressively degenerating, the ALJ could have reached a different disability determination had she fully developed the record and obtained an expert medical opinion regarding the effects that her knee condition had on Plaintiff's ability to work.  Accordingly, the ALJ's failure to obtain medical opinion evidence regarding the effects of Plaintiff's chronic knee pain, along with her other impairments, prejudiced her claim, and remand is required on this basis.[9]

### III. CONCLUSION

The Commissioner's decision is **REVERSED**, and the case is **REMANDED** to the Commissioner for reconsideration.

---

[9]  Because the ALJ's proper determination of Plaintiff's RFC on remand will likely affect the remaining issue regarding the interaction between her obesity and her knee condition, it is not addressed.

**SO ORDERED** on this 30th day of March, 2015.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE